IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SALIM LOKHANDWALLA,<br>     Defendant. | CRIMINAL FILE NO.<br><br>1:15-CR-252-MHC-GGB |

**FINAL REPORT AND RECOMMENDATION**

Defendant Salim Lokhandwalla ("Defendant") is charged in a twelve count indictment with importation of drugs into the United States using false declarations and misbranding the drugs that he received in interstate commerce with the intent to defraud and mislead. (Doc. 4). Pending before the court are Defendant's Motion to Suppress Evidence, (Doc. 13), and Motion to Suppress Evidence from Yahoo Emails, (Doc. 14). An evidentiary hearing on the Motion to Suppress Evidence was held before the undersigned Magistrate Judge on August 27, 2015. (Doc. 18). All transcript references are to that hearing. For reasons discussed below, I recommend that the Motions to Suppress be denied.

**I.     FACTS REGARDING WARRANTLESS SEARCH OF PACKAGES**

On December 9, 2014, Postal Inspectors Gina Harrell and Martin Glover were in the Doraville, Georgia, Post Office on matters unrelated to the instant case. (Tr.

9). While in that Post Office, Inspector Harrell noticed a box sent from Hong Kong that was heavily sealed with yellow tape. As Inspector Harrell walked through the Post Office she saw three more boxes that were from Hong Kong and similarly taped. The declarations on two of the boxes said that the contents were beauty products. (Tr. 9, 15-16).

In previous investigations, Inspector Harrell had discovered that boxes from China with similar yellow tape had contained illegal steroids. (Tr. 9). She had also discovered on previous occasions, that packages from China that declared the contents to be beauty products, actually contained illegal steroids. Inspectors Harrell and Glover picked up and shook the boxes. The sound when shaken and the weight of the contents of the boxes led the inspectors to believe that the contents were pills. Therefore, Inspector Harrell suspected that the boxes from Hong Kong with the yellow tape that were declared to contain beauty products contained steroids. The boxes were still in the mail stream and were sealed. Inspector Harrell believed that they had not been tampered with or opened. (Id. at 15-16).

The boxes were addressed to "Sam" at an address in Doraville. The two inspectors took the boxes to the address to which they were addressed. (Tr. 17). When the inspectors arrived at the address, they observed that it was a business, but

there was no indication of what type of business was conducted at that location. (Tr. 18). Inspector Harrell asked a woman at the desk of the business if she could speak to Sam, and the woman responded that she did not know who Sam was. The woman told the inspectors that the business intended to transport the packages addressed to Sam by truck to Houston, Texas, without opening them. The inspectors did not deliver the boxes to the business and kept them in their possession. (Tr. 18-19).

The Postal Inspectors contacted Homeland Security for assistance in further investigation. The following day, Special Agent ("SA") J. D. Cannon with Immigration and Customs Enforcement ("ICE"), part of Homeland Security, went to the Postal Inspection Service offices to further investigate the boxes. (Tr. 54). SA Cannon believed that he could conduct an extended border search of the boxes with some form of reasonable suspicion as long as he knew that there had been no material change in the items to be searched and they remained in the control of the Postal Service. (Tr. 57).

SA Cannon's supervisor and a postal inspector briefed him about the investigation that had been conducted by the Postal Inspectors. (Tr. 62). Agent Cannon saw that the contents of the packages were described as beauty supplies and that the packages were excessively taped. (Tr. 63). He shook the packages and

concluded that the weight and rattling sound of the contents were consistent with pills rather than beauty products. (Tr. 64-65). He knew that the packages were from China or Hong Kong. (Tr. 65). SA Cannon had seen a lot of synthetic heroin, steroids, and other illegal substances that had been shipped out of Hong Kong or China to the United States.

In Agent Cannon's experience, the origin of Hong Kong or China, the excessive taping, the sound when shaken, and the weight of the packages were consistent with packages that contained some type of contraband rather than beauty products. (Tr. 65-66). He also observed that there was no indication that the packages had been tampered with because they were excessively sealed. (Tr. 66). Based on the totality of his knowledge and experience, SA Cannon believed that he had authority to open the boxes. (Tr. 66). SA Cannon subsequently opened and searched the boxes without a search warrant. Later boxes were searched pursuant to a search warrant that relied upon the evidence from the warrantless searches. Defendant's challenge to the search of the boxes searched pursuant to the search warrant is based on the alleged unlawfulness of the warrantless searches of the original boxes found in the Doraville Post Office.

## II. DISCUSSION OF WARRANTLESS SEARCHES OF BOXES

### A. The warrantless searches of the boxes on December 10, 2014, was authorized as an extended border search.

The parties agree that whether the warrantless search of the boxes was lawful depends on whether the search was justified as an extended border search. An extended border search without a warrant is reasonable when the following elements are present: (1) "reasonable certainty that a border crossing has occurred," (2) "that conditions have remained unchanged from the crossing until the search," and (3) the search is supported by reasonable suspicion of criminal activity. United States v. Garcia, 672 F.2d 1349, 1364 (11th Cir. 1982).

Defendant does not dispute that the first element was satisfied. However, he argues that the government failed to establish with reasonable certainty that the condition of the packages remained unchanged from the time they crossed the border until they were searched, and that the agents had reasonable suspicion of criminal activity.

1.  **The government sufficiently established that the conditions of the boxes remained unchanged from the border crossing until the search.**

The government's evidence established that the boxes were in the Post Office awaiting delivery and were heavily sealed when they were first seen by the Postal Inspectors. Inspector Harrell testified that she believed that the boxes had not been tampered with or opened. While the government did not present direct evidence that proved the chain of custody of the boxes from the time that they entered the United States until they were observed by the Postal Inspectors, such evidence is not necessary. There was sufficient circumstantial evidence that the condition of the boxes remained unchanged from the time they entered the United States until the search. See United States v. King, 517 F.2d 350 (5th Cir. 1975)(finding warrantless Customs search at Alabama post office of mail which had entered the country in California was lawful since it was unlikely that anything could be added to or taken from the envelope while it was in transit); see also State v. Gallant 308 A.2d 274 (Me. 1973)("[A]s mail remains in the custody of Postal authorities from the time it enters the country until the time it is delivered to the addressee, continuity and integrity of condition are virtually assured.") Thus, I reject Defendant's first argument.

### 2. The warrantless searches were supported by reasonable suspicion of criminal activity.

Defendant next argues that the searches were not supported by reasonable suspicion of criminal activity. I disagree. Reasonable suspicion is less than probable cause and is determined from the totality of the circumstances and the collective knowledge of the officers involved in the stop. United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989). To establish reasonable suspicion, the police must articulate facts that may include "the modes or patterns of operation of certain kinds of lawbreakers." Id. (quoting United States v. Cortez, 449 U.S. 411 (1981)).

The following factors, which were known collectively to the Postal Inspectors and SA Cannon prior to the search provided reasonable suspicion that the packages contained contraband:

- The packages could have been mailed directly to their final destination in Houston, but instead were mailed to an unnamed business at an address in Doraville, Georgia, to be transported, at greater expense, by truck to "Sam" in Houston. This method of delivery suggests that the recipient wanted to eliminate a direct easily traceable link between himself and the packages, (Tr. 28);

7

- The packages were from Hong Kong, a location from which similar packages containing illegal drugs had been sent to the United States;

- The packages were excessively taped, a characteristic that law enforcement agents had observed in packages containing illegal drugs;

- Although labelled "beauty products", based on the weight and the rattling sound when shaken, the agents believed that the contents of the packages were pills rather than beauty products.

These factors are ample when compared to those in other cases (cited in King) where warrantless searches of mail from outside the United States have been upheld. Cf. United States v. Doe, 472 F.2d 982 (2d Cir. 1973)(upholding search by customs officer of package mailed from South America and marked "old clothing" where officer's experience indicated such a package might be falsely labeled); United States v. Swede, 326 F.Supp. 533 (S.D.N.Y.1971)(upholding the opening of an envelope from which some white powder had escaped, even though the powder reacted negatively to tests for heroin and cocaine); United States v. Beckley, 335 F.2d 86 (6th Cir. 1964)(upholding the opening of a package weighing between nine and ten pounds because a Customs clerk suspected that it contained something other than the

8

two wall mats, four pillow cases and two dress robes declared on the outside of the box).

For these reasons, the warrantless searches of the boxes on December 10, 2014, were authorized as an extended border search.  Because the warrantless searches were lawful, there is no basis to suppress the later searches that were based on a search warrant application that referred to the warrantless searches.

### III. FACTS RELATED TO SEARCH WARRANT OF YAHOO ACCOUNT

As part of its investigation, the government sought and obtained a search warrant served on Yahoo to seize all information, including emails, related to Defendant's email account (salim1236@yahoo.com).  (Doc. 13-1).  To the extent that Defendant argues that the search warrant was defective because it relied on the contents of the packages searched without a warrant, that argument is without merit.  For reasons discussed above, the warrantless search of the packages was a proper extended border search.

Defendant also argues that the affidavit for the Yahoo search warrant did not provide probable cause because there was no nexus between the crime and the emails.  (Doc. 14).  That argument is addressed and rejected below.

On April 24, 2015, Jessica Owen, a Special Agent with the United States Food and Drug Administration's Office of Criminal Investigations applied for and obtained a search warrant from United States Magistrate Judge Russell Vineyard for contents of emails and all other records relating to Defendant's email address with Yahoo.  (Doc. 13-1).

In paragraph 12 of her affidavit, Agent Owen stated that the owner of a UPS store in Hoover, Alabama, advised her that defendant opened a mailbox at his store, that defendant directed him to reship boxes received at his mailbox to defendant's address in Texas, that defendant received 2-3 boxes a week from Hong Kong, that some of the Customs declarations on the boxes described the contents as toys or beauty products, that the witness had seen the contents of a couple of boxes that broke open and observed the contents to be Chinese Viagra pills.  Significantly, Defendant directed the owner of the UPS store to send an email to the subject Yahoo email account with the tracking numbers for the reshipments whenever the store shipped something to him in Texas.  (Id. ¶ 12).

In addition, paragraph 11 of the affidavit states that a Birmingham detective obtained a search warrant for five boxes addressed to the defendant at the same UPS store.  After opening the boxes, the Birmingham detective discovered that the five

10

boxes contained male enhancement pills which were known to the FDA to contain the active pharmaceutical ingredients in Viagra and Cialis.  (Id. ¶ 11).

Paragraph 13 states that the detective in Alabama turned over the pills from the boxes she searched to Agent Owen; paragraph 15 states that Agent Owen sent a sampling of pills from the boxes searched in Alabama to the forensic lab for testing; and paragraph 24 states that the lab reported that the pills contained Sildentafil, the active pharmaceutical ingredient in Viagra, or Tadafil, the active pharmaceutical ingredient in Cialis.  (Id. ¶¶ 13, 15, 24).

In paragraph 14, Agent Owen recounted her telephone interview with Defendant on January 21, 2015, about the shipments that he was receiving at the UPS store in Hoover, Alabama.  In that interview, Defendant admitted that he was receiving male enhancement pills from China and that he did not know why the shippers falsely declared the contents as toys or beauty products.  Defendant also told Agent Owen that he was not receiving shipments of male enhancement pills at any other addresses.  Agent Owen told Defendant that the pills from China were illegal and Defendant stated that he would stop buying and selling the pills immediately.  (Id. ¶ 14).

11

The affidavit also states that, after Agent Owen's January 21, 2015 telephone call with Defendant, Defendant received at least sixty-five parcels from China at a UPS store in Decatur, Georgia, most of which were labelled "beauty products." (Doc. 14-1 ¶ 21)  One of the boxes had broken open and Inspector Glover observed that it contained illegal male enhancement pills.  (Id. ¶ 20).  The Decatur store reshipped the packages to Defendant in Houston.

On April 16, 2015, the UPS store in Decatur received an email from the subject email account in which Defendant inquired about the tracking number for the box that the store sent to him on April 15, 2015.  (Id. ¶ 22).  On April 17, 2015, at a postal service processing facility, Postal Inspector Glover observed that a package addressed to Sam at the Decatur UPS store had broken open and contained boxes containing the same type of male enhancement pills that Defendant had received in Alabama.  (Id. ¶ 23).

### III. DISCUSSION RELATED TO SEARCH WARRANT OF YAHOO! ACCOUNT

The task of a judicial officer from whom a search warrant is requested is simply to make a practical, common sense decision of whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or

evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  Probable cause deals with probabilities not technicalities.  Thus, the judicial officer must consider the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and common sense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  Gates, 462 U.S. 213, 103 S.Ct. 2317; United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).

Applying the above standards, the magistrate judge could easily conclude that the subject email account was being used to communicate with shippers regarding the shipments of illegal drugs within the United States.  Therefore, there was a fair probability that the evidence sought in the search warrant would provide evidence of a crime.  Accordingly, there is no basis to suppress the evidence obtained through the Yahoo search warrant.

## IV. CONCLUSION

For the above reasons, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress [Docs. 13 and 14] be **DENIED**. There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 12th day of November, 2015.

_____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

14